makes application in proper form against the defendant for suitable provision for her support and maintenance.

It would seem, also, that the judgment is wrong in not requiring plaintiff to make restoration of what she has received under the contract so far as it is in her power to do so. Hungerford v. Hungerford, 161 N. Y. 550, 56 N. E. 117. It is alleged in the answer which for the purposes of this appeal must be taken as true that the household furniture, which plaintiff received under the contract was worth $650. It does not appear that she cannot return this property, nor that she has expended for her support what the defendant paid her under the contract.

The judgment should be reversed, without costs, and a new trial granted.

CHESTER and SEWELL, JJ., concur. KELLOGG, J., concurs in result. SMITH, P. J., not voting.

---

PEOPLE v. THISTLETHWAITE et al.

(Supreme Court, Appellate Division, Fourth Department. November 17, 1909.)

COVENANTS (§ 103*)—CONSTRUCTION—VIOLATION—"COMMERCIAL."

The owners of certain land conveyed it to the state, and covenanted that certain remaining land belonging to them should not be sold for commercial-agricultural, manufacturing, or other purposes, but should be used and sold exclusively for permanent forestry, hotel, camp, and cottage purposes, and that all deeds given by either of such grantors should contain a clause binding the purchaser, his heirs and assigns, to a perpetual use of the lands for permanent forestry, hotel, camp, and cottage purposes. Held, that the term "commercial" should not be construed as limited only to "agricultural" but also as applicable to "manufacturing or other purposes," and hence a contract to cut timber from the reserved land for pulp manufacture was unauthorized; nor was it allowable by way of preparing the land for sale for camp and cottage purposes.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 169; Dec. Dig. § 103.*

For other definitions, see Words and Phrases, vol. 2, p. 1299.]

Appeal from Judgment on Report of Referee.

Action by the People against William J. Thistlethwaite and others. From a judgment for plaintiff, defendants appeal. Affirmed.

The following is the opinion of Merwin, Referee, on which the judgment is affirmed:

On January 16, 1896, William Seward Webb and the Ne-ha-sa-ne Park Association conveyed to the people of the state of New York about 75,000 acres of land within the limits of the Forest Preserve. A portion of this amount, consisting of five parcels, aggregating 15,289 acres, was located in township 8 of John Brown's tract. The grantors owned other lands in township 8, and in the deed it was, among other things, covenanted by the grantors that none of the remaining lands in township 8, belonging to the grantors or either of them, which had not been theretofore contracted by them to be sold "shall be used or sold for commercial-agricultural, manufacturing or other purposes, except as mentioned in said Thomson contracts, but the same shall by the parties of the first part, their heirs and assigns, be used and sold exclusively for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

permanent forestry, hotel, camp and cottage purposes," and that all deeds given by either of them should contain a clause "binding the purchaser thereof, his heirs and assigns, to a perpetual use of said lands for permanent forestry, hotel, camp and cottage purposes."

From the remaining lands above referred to, which had not been contracted to be sold, Webb, on December 10, 1902, conveyed to the defendant Thistlethwaite certain specified lots, on Fourth Lake of the Fulton Chain of Lakes, as allotted and surveyed by David C. Wood, surveyor, the map of the allotment and survey being dated August 30, 1893, and filed in the office of the clerk of Herkimer county on August 30, 1893. A portion of those lots constitutes the parcel of about 125 acres described in the complaint. This deed was, in substance, made subject to the restrictive covenant in the deed to the people, and contained a covenant by the grantee that the land conveyed should not be used or sold "for commercial-agricultural or manufacturing purposes, but shall be used and sold exclusively for permanent forestry, hotel, camp or cottage purposes." On the 6th of March 1905, Thistlethwaite made an agreement in writing with the defendant Hinckley Fibre Company, by which, among other things, he sold to that company "the soft wood timber suitable for lumber or manufacturing purposes above four inches in diameter, two feet from the ground, and also all the hard wood timber above ten inches in diameter, two feet from the ground," upon certain lots, being the lots comprised in the parcel of 125 acres. About June 1, 1905, the Hinckley Fibre Company commenced to cut the timber, and continued to about June 27th, when they stopped at the instance of the Attorney General of the state. In the following September, after an interview with the Attorney General in which he told them that, if they would leave the hard wood they could go on with the cutting, they continued the cutting and drawing of the soft wood until the spring of 1906; the hardwood was not cut, the contract as to that effect being surrendered on Nov. 24, 1906. About January 1, 1907, the work was resumed, and continued as to the softwood until the commencement of this action on March 19, 1907.

Upon the part of the plaintiff it is, in effect, claimed that, under the restrictive covenants above referred to, the sale to the Hinckley Company was not permissible, and that therefore its accomplishment should be restrained. Upon the part of the defendants it is claimed that the covenants have not been violated, and that the sale to the Hinckley Company was permissible by way of preparation of the tract for use and sale for hotel, camp, and cottage purposes.

The sale to the plaintiff was negotiated by the Forest Commission, apparently under the authority of chapter 561, p. 237, Laws 1895. Upon its purchase, the land became a part of the Forest Preserve and subject to the constitutional provision that the lands of the state constituting the preserve should be forever kept as wild forest lands. The lands remaining to the grantors in township 8, after giving the deed of January 16, 1896, consisted largely of lands surrounding or near to several lakes, some of them of considerable size, and upon such lands, as indicated by the map or allotment filed August 30, 1893, lots were laid out which, upon Fourth Lake of the Fulton Chain, had a frontage on the lake of about 200 feet and ran back to include an area of 5 to 10 acres in a lot. The lots upon the lands abutting upon the other lakes were of similar character. Each of the five parcels conveyed to the state abutted more or less upon these lots, or were near to them.

The policy of the state was to have a preserve of wild forest lands. The restrictive covenants did not go so far, but imposed limitations upon what would otherwise be the ordinary use as then understood. By the law as it then existed, the Forest Commission were charged with the duty of protecting the forests in the Forest Preserve. It had charge of the public interests of the state with regard to forestry and tree planting, and especially with reference to forest fires, and was charged with certain duties in the promotion of an interest in behalf of forestry in the schools of the state. Section 271, c. 395, p. 244, Laws 1895. It may, I think, be assumed that the Forest Commission, in the discharge of its duty to the interests of the state, obtained the covenant in question. It is somewhat peculiar in form. It first provides as to what shall not be done, and then provides as to what shall exclusively be done. Effect must be given, if possible, to both of these provisions.

Upon the part of the defendants it is, in effect, claimed that the term "commercial" applies only to the term "agricultural." That would lead to the conclusion that, aside from the Thomson contracts, which expired some years ago, there could be no use or sale of the lands. Clearly this was not the intent of the parties. Having in view the situation of the parties, and the lands sold to the plaintiff, as well as those in regard to which the covenants were made, and the purpose or object sought to be accomplished, and in order to give substantial effect to all the language used, the term "commercial" should be construed to apply not only to agricultural but also to "manufacturing or other purposes." This would operate to exclude all commercial uses or sales, and that, I think, was the intention of the parties.

The sale of the Hinckley Company was of the soft wood timber suitable for lumber or manufacturing purposes above four inches in diameter, and all the hard wood timber above 10 inches in diameter, with right to enter and cut such roads as should be necessary to carry on proper lumbering operations. The company proceeded to the cutting of all merchantable soft wood in the ordinary way of lumbering. Upon 64 acres lumbered over on the east side of Eagle creek, it appears that about 2 miles of road were cut. The tops of the trees cut and the brush were left on the ground. The agreement of sale to the Hinckley Company authorized the ordinary lumbering operation. The product was "pulp wood" as understood by all parties, and was obtained for the purpose of being manufactured into pulp. The transaction was a commercial one. The cutting was not, according to the evidence, proper for permanent forestry. The contract was, I think, within the prohibition of the covenant, unless, as claimed by the defendants, it can be deemed to have been proper by way of preparation for use and sale for hotel, camp, and cottage purposes.

Soon after the purchase by Thistlethwaite, he took steps toward the making of a new allotment, and had this in contemplation at the time of the sale to the Hinckley Fibre Company. Surveys were made for that purpose in February and May, 1906, and a new allotment or map completed in June, 1906, and several lots were thereafter and before the commencement of this action sold from that allotment. The negative covenant in the deed to the plaintiffs was operative on all the remaining lands of the grantors. It therefore covered the lands included in the allotment then existing, and so included the lots conveyed to Thistlethwaite, a portion of which constitute the tract in controversy. The fact of an allotment did not abrogate the covenant. All of the lands conveyed to Thistlethwaite were within the original allotment, and still the deed to him expressly continued the covenants upon the lands conveyed. Can it properly be said that in the preparation of lots for sale the negative covenant can be disregarded? Such a preparation may be convenient, but it is not shown to be a matter of necessity.

A great many trees are left upon the premises, enough it may be, to constitute a forest. That, however, is not the question here; but it is whether, in the exercise of the right to use and sell the lands for camp and cottage purposes, the grantee has the right to use and sell the lands for a purpose expressly forbidden. The fact that the Hinckley Company have surrendered the right to cut the hard wood does not, I think, relieve the situation. Thirty to 35 per cent. of the wood on the tract was soft wood. It was certainly a material element.

But it is said that the Attorney General of the state gave the defendants the right to cut the soft wood, and therefore the plaintiff has no standing now for relief. I am cited to no authority which gives the Attorney General the power to abrogate or discharge the covenant in question. Nor do I see any basis for an estoppel. No damages are claimed against the defendants. They are not placed in any worse position than they were prior to the act of the Attorney General.

What meaning is to be given generally to the term "permanent forestry" is not necessary here determine. The question here is whether the agreement and sale in question is authorized, notwithstanding the negative covenant. It can hardly be assumed that the parties, after providing the negative covenant, would immediately in effect provide that it might be disregarded or nullified.

I am therefore of the opinion: That the use and sale in question is within the prohibition of the negative covenant; that the affirmative covenant should not be construed to nullify or override the negative covenant, and therefore does not justify the said use and sale; that such use and sale cannot be justified upon the theory that they are allowable by way of preparation for sale for camp and cottage purposes; and that the plaintiff is entitled to an injunction restraining any further cutting under the said agreement or sale.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Snyder, Christman & Earl, for appellants.
John K. Ward, for the People.

PER CURIAM.    Judgment affirmed, with costs, on opinion of Merwin, Referee.

---

MURPHY et al. v. NUMBER ONE WALL STREET CORPORATION et al.

(Supreme Court, Special Term, New York County.    December 2, 1909.)

1. CONTRACTS (§ 300*)—BUILDING CONTRACTS—PERFORMANCE—DELAY—EXCUSE.
   Where the work to be performed by a building contractor cannot be performed until other work to be done by the owner or his employés is finished, the failure of the owner or his employés to complete such other work excuses the contractor for his delay in completing the work.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1378; Dec. Dig. § 300.*]

2. CONTRACTS (§ 300*)—BUILDING CONTRACTS—PERFORMANCE—DELAY—WAIVER.
   Where a subcontractor required to complete his work within 50 work days was not permitted to enter on the work until several months after the making of the contract because of the act of the contractor, who thereafter allowed the subcontractor permission to perform the work, the contractor could not recover damages for the failure of the subcontractor to complete the work within the time specified.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1372–1381; Dec. Dig. § 300.*]

3. CONTRACTS (§ 306*) — BUILDING CONTRACTS — PERFORMANCE—DELAY—COMPLETION BY OTHER PARTY.
   Where a contract employing a subcontractor stipulated that on failure of the subcontractor to supply a sufficiency of skilled workmen or materials, or on a failure to perform the agreements in the contract, the contractor might, on three days' written notice, provide the labor and deduct the cost from any money that might be due to the subcontractor, and the contractor did not give any notice to the subcontractor, the contractor could not demand reimbursement for the failure of the subcontractor to perform certain things.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1531, 1532; Dec. Dig. § 306.*]

4. CONTRACTS (§ 306*)—BUILDING CONTRACTS—PERFORMANCE—DELAY—EXCUSE.
   Where a subcontractor did not agree to reimburse the contractor for elevator service or for gasoline and coke furnished, the contractor could not demand reimbursement therefor on completing the work left undone by the subcontractor.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1531, 1532; Dec. Dig. § 306.*]

Action by Francis J. Murphy and another, copartners, doing business as Murphy Bros., against the Number One Wall Street Corporation and others.    Judgment directed for plaintiffs.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes